### PEOPLE v. SLATER.

1. INTOXICATING LIQUORS — LOCAL OPTION — PROHIBITION — STATUTES.

    The local-option law does not prohibit the individual use of intoxicating liquors or prevent the decent exercise of hospitality of the host towards guests in his home; but it is intended to prohibit all traffic in liquors.

2. SAME—GUESTS—FURNISHING LIQUORS IN HOME.

    Whether or not the act of respondent, who permitted a friend to drink from a bottle of whisky in his room, without express invitation, was an honest act of hospitality to a guest, was a question of fact for the jury, under evidence from which different inferences might properly be drawn.

3. CRIMINAL LAW — TRIAL — INTOXICATING LIQUORS — DIRECTING VERDICT.

    In a prosecution for unlawfully furnishing intoxicating liquor to a person in a local-option county, the attorney for respondent did not waive his right to insist that questions of fact be submitted to the jury, by contending that the court should direct a verdict in his favor.

Exceptions before sentence from Clinton; Searl, J. Submitted October 21, 1910.  (Docket No. 152.)  Decided December 30, 1910.

Frank Slater was convicted of violating the local-option law.    Reversed.

*Edward J. Moinet,* Prosecuting Attorney, for the people.

*Walbridge & Kelley,* for respondent.

MOORE, J.  The respondent is charged with a violation of the local-option law.  At the close of the testimony offered by the people, his counsel asked the court to direct a verdict of acquittal.  The judge said he would overrule the motion for the present, but would hear counsel at the close of all the testimony.  Testimony was then introduced on the part of the respondent.  At the close of all the testimony, in response to an inquiry by the judge, counsel on both sides said they regarded it as the duty of the judge to direct a verdict.  The judge instructed the jury, in substance, that it was their duty, under the evidence, to convict the respondent.  The jury retired to the jury room and after a time returned a verdict of guilty.  The case is here upon exceptions before sentence.

Counsel for respondent make two claims, first, that a verdict of acquittal should have been directed in favor of respondent; citing the cases of *People* v. *Peterson,* 156 Mich. 235 (120 N. W. 570, 21 L. R. A. [N. S.] 134), and *People* v. *Bedell,* 162 Mich. 230 (127 N. W. 33).

The second contention is (we quote from the brief):

" The second point in this case is that if the Supreme Court should hold that the trial court was justified in refusing to direct a verdict in respondent's favor, he still had the right to have his case passed upon by the jury, because the matter of his intent was involved.  The charge of the court was faulty in not presenting to the jury the question whether respondent was acting in good faith or attempting and intending to evade the law. *People* v. *Bedell,* 162 Mich. 230 (127 N. W. 33); *People* v. *Peterson,* 156 Mich. 235 (120 N. W. 570, 21 L. R. A. [N. S.] 134); *People* v. *Neumann,* 85 Mich. 98–104 (48 N. W. 290).  There was no material dispute upon what took place in respond-

ent's room, and the only question left was whether respondent's acts constituted a violation."

It is apparent that a comparatively full statement of the testimony is necessary to a determination of the questions presented. Mr. Keyes testified:

"That he was 54 years of age; that both witness and respondent had resided at said city of St. Johns for a number of years; and that they were both painters and paper hangers by trade, and had been acquainted and on friendly terms for about 30 years."

On the day in question, the witness testified:

"I don't know when I had seen Slater before then. I seen him about Fair time, and I probably might have seen him before that.

"Q. Just tell the jury how you came to meet him down there on Clinton avenue.

"A. Well, sir, I came down Clinton avenue on Sunday between 8 and 9 o'clock in the morning and met him down there in front of the Kenyon Block. No one else was present that I know of.

"Q. Well, what conversation did you have there with him at that time?

"A. We was talking about going away: I told him I was going away to look for a job, and he said if I would wait a week or two he could go with me. * * *

"Q. What talk did you have about going up to his room, if anything?

"A. Nothing in particular, only he said something about going up, and I went up with him. He said, 'We will go up to the room and have a talk,' something to that effect. When I got up to his room I took a chair and sat down.

"Q. What did he do?

"A. Well, sir, he unlocked his trunk, and got out a little booze—whisky. It was in a quart bottle I should judge, and was about two-thirds full. He said he got it to Owosso the Saturday before.

"Q. What did he do with the bottle when he took it out of the trunk?

"A. He set it upon the stand. The stand set right in front of me. I sat down by the stand.

"Q. What did you do?

"*A*. I took a drink. I think maybe he took one. There was whisky in the bottle."

Slater and witness remained there probably an hour and one-half.

"*Q*. I ask you whether or not you had any more drinks out of that bottle?

"*A*. I took a few, probably five or six; Slater might have taken one or two more. There might have been two or three inches of whisky left in the bottle when I left the room—that is my judgment. I felt the whisky that I drank there, and it caused me to become intoxicated at that time * * * We did not have a meal or anything to eat there at that time. There was a stand and bed, chairs, and trunk in the room. There were no cooking utensils of any kind that I noticed. * * * None of the liquor I had there was mine. I had not had any liquor that morning prior to meeting Slater and going up to his room. I was sober when I went up there. I had seen him in that room before. I probably had five or six drinks of liquor out of that bottle that morning when I went out of the room. I went down stairs; nobody went with me. I don't know where Slater went; he was in the room when I left. I went out of the room and downstairs on the street—in front of the Kenyon Block. I was intoxicated at the time I got down on the street, on Clinton avenue."

His cross-examination did not differ materially from his direct examination, except as follows:

"He did not ask me to have a drink of whisky. He said he had a little something to drink, and he got it and sat it up on the stand, and I helped myself.

"*Q*. When did he say that?

"*A*. When we was upstairs, after we had gotten into the room.

"*Q*. When is it you claim when he said something about having a little whisky or something to that effect?

"*A*. It was after we were up in the room, I guess it was after he went to the trunk; it was after he got it out of the trunk and set it on the stand.

"*Q*. After that, every time you wanted a drink, you took it?

"*A*. Yes, sir.

"*Q*. Without any invitation from Mr. Slater or anything being said about it?

"*A*. Yes, sir.

"*Q*. Now, I ask you, Mr. Keyes, if, during the time you were there after you had gotten upstairs, Mr. Slater asked you or invited you by word of mouth to take any whisky?

"*A*. No; he didn't ask me personally to take a drink?"

On redirect examination the witness testified that respondent did not make any objection to witness drinking out of the bottle.

"*Q*. And at times I asked you whether or not, when you took a drink, Slater would drink following you?

"*A*. Yes, sir; when I left the room finally the bottle was on the stand."

George Tinkham, city marshal, testified that on the day in question he saw Keyes in front of the Kenyon Block. He came out of the stairway out of the Kenyon building.

"I have been upstairs on the second floor and know where Slater had a room up there. This stairway led down on the street from where this room was located. When I first noticed Keyes he stepped out of the stairway and commenced to stagger, and he started south staggering along on the walk until he came to the railing around the entrance to the cellar in front of the Little building and he got hold of that."

The respondent was a witness in his own behalf. He testified in part as follows:

"That he was 40 years of age, and was a painter and paper hanger by trade; that he had been engaged in that business at St. Johns for 16 years, where he had lived all his life; that he had been and was on friendly terms with Aretus Keyes, and had worked with him at various intervals; that on the day in question he had a stopping place at St. Johns, which was the room in the Kenyon Block over Willoughby's restaurant, where he stopped while in St. Johns since the 12th day of August up to October 24, 1909; that he kept his clothing and personal effects in that room; that prior to October 24th he had been working at Fowler at his trade continuously for about 9 weeks; that he came to St. Johns every Saturday night and occupied this room; that he had no other stop-

ping place in St. Johns on October 24, 1909; that he had no other home, and that St. Johns was his residence; that while standing on the sidewalk in front of the Kenyon Block on the day in question Keyes came up, and they engaged in conversation; that Keyes wanted to know how he was getting along at Fowler, and that respondent told him he would be through in a couple of weeks. * * *

"*Q*. To refresh your recollection did you say anything to him about coming up stairs?

"*A*. No, sir; I spoke that I was going upstairs, and I says, 'I will have to go upstairs, I have got some letters to write.' He didn't say anything only he followed along up. When they got into the room respondent unlocked his trunk, got out some stationery and put it on the commode. Keyes sat down in a chair. That there was a bottle of whisky in the room on that day between the trunk and the commode, and that it was there before the trunk was opened and sat on the floor.

"*Q*. After you got the stationery and put it on the commode, what happened, if anything?

"*A*. Not anything; I shut the trunk down and sat on the trunk, and we sat there talking. That respondent had not put his hands upon the bottle or said anything about it up to this time; that Keyes moved his position from where he sat on the chair, and sat down on the window stool, where he could see the bottle sitting at the end of the trunk. After doing this he got up and went over and said, 'What is this?' Then he took a drink from the bottle, and set it down upon the commode; that up to that time respondent had not said anything about the bottle; that Keyes did this after respondent took the stationery out of the trunk.

"*Q*. And did Keyes help himself to that bottle further during that time?

"*A*. He did.

"*Q*. Did you drink some of it?

"*A*. I did.

"*Q*. How many times did you, do you recall?

"*A*. I drank twice.

"*Q*. Do you recall how many times Keyes drank from it?

"*A*. No, sir; I don't.

"*Q*. Did you ask or invite Keyes by word of mouth to take any liquor from the bottle?

"*A.* No, sir.

"*Q.* Nothing was said about having a drink or having liquor when you went up stairs?

"*A.* No, sir."

On cross-examination respondent testified:

"*Q.* How many times have you been arrested, Mr. Slater?

"*A.* I don't remember; I think it is five times. That the first time was about 12 years ago for getting drunk— that he pleaded guilty; that about a year after that time he was arrested on a drunk and disorderly charge, pleaded guilty and paid his fine; that perhaps four or five years later he was arrested for being drunk and disorderly, pleaded guilty, paid his fine; that after that in the year of 1908 he was arrested for being drunk and disorderly, charged as a second offense, and that he paid his fine; that in the summer of 1909 he was arrested for violating the local-option law, pleaded guilty, and served time in the county jail."

The respondent further testified, on cross-examination:

"*Q.* Did you change your residence from St. Johns shortly after the 24th day of October, 1909?

"*A.* Yes, sir.

"*Q.* Where did you go?

"*A.* Detroit; I went from Fowler to Portland, and from Portland to Detroit.   *   *   *

"*Q.* How did you go from Fowler to Portland?

"*A.* I walked the most of the way.

"*Q.* You left Fowler when you heard a warrant had been issued for you?

"*A.* Yes, sir; and walked from there to Portland.
*   *   *

"*Q.* Where were you the day before the 24th of October last?

"*A.* Owosso; I went down there to get something to drink; I got a quart of whisky there.

"*Q.* Anything else?

"*A.* No, sir.

"*Q.* Did you get some beer?

"*A.* Yes.

"*Q.* I think you said a moment ago you didn't get anything else?

"*A.* I didn't think of the beer at that time. I got three

pint bottles of beer and a quart of whisky, and brought it back to St. Johns, and took it to my room in the Willoughby boarding house. I drank the beer that night and quite a lot of the whisky, better than one-third of it. There was about two-thirds of the whisky left in the bottle the next morning. * * *

"*Q.* What did you leave Fowler for and go over to Westphalia and from there to Portland and from Portland to Detroit?

"*A.* Because I knew this warrant was out for me on this local option.

"*Q.* For furnishing liquor to Aretus Keyes?

"*A.* For this violation, yes. I simply ducked."

On cross-examination the witness further testified:

"It was somewhere around 9 o'clock that morning I met Keyes down on the street. We stood at the foot of the stairs talking. I says, 'I have got to go up and do some writing.' I started up, and he followed me up the stairs, and I didn't ask him to come along up, and he had never been up to my room before. We had been talking in the neighborhood of 10 minutes before we started upstairs. I unlocked the door, and when I got in there I went to the trunk and opened it and took out some stationery. I had not had a drink out of the bottle that morning. I took the last drink out of it the night before and about two-thirds remained in the bottle at that time. * * * That when Keyes saw the bottle he took a drink out of it and put it down on the commode, and that about 15 minutes after respondent took a drink from the bottle; that when respondent took a drink he set the bottle on the floor; that Keyes then took it and drank and set it on the commode; that respondent took another drink and set it down on the floor.

"*Q.* Right down in front of Rete?

"*A.* No; at the end of the trunk where he was sitting.

"*Q.* What did you set it back there for?

"*A.* I don't know why, but I did.

"*Q.* Were you afraid somebody would come in?

"*A.* Yes, sir.

"*Q.* Was your door locked?

"*A.* Yes, sir.

"*Q.* What did you lock that door for if Rete was only going up there to see you write a few letters?

"*A.* I don't know why; I always do when I go in there.
*    *    *

"*Q.* You were willing that he might have that whisky, weren't you?

"*A.* Why, yes, I think so.

"*Q.* And he picked it up and took a drink, and what did he do with the bottle?

"*A.* He set it on the commode; then I took it up. That there was no cork in the bottle it having been destroyed the night before. I picked the bottle up and took a drink myself, and set it down to the end of the trunk.

"*Q.* Why didn't you hand it to Rete?

"*A.* I didn't.

"*Q.* He was an old friend of yours, wasn't he?

"*A.* Yes, sir.

"*Q.* You and he were drinking there together?

"*A.* Yes, sir.

"*Q.* It was your whisky?

"*A.* Yes, sir.

"*Q.* You were in your room?

"*A.* Yes, sir.

"*Q.* Why didn't you hand him the bottle?

"*A.* I don't know.

"*Q.* Did you think you were not furnishing him that liquor if you would set that bottle by the trunk again?

"*A.* No; I was not furnishing it.    *    *    *

"*Q.* How long was it before he went down?

"*A.* I don't know; I went into the closet maybe seven or eight minutes, when I came back Rete was gone. He was just coming out of the room when I came back. I think he was not under the influence of liquor to any extent at that time—that is, he didn't show it.

"*Q.* He didn't show it at all?

"*A.* Only by his talk; he didn't stagger at all. I think he went right down stairs from my room out on the street. After Rete went out I wrote a letter. After that I went over to the hotel for dinner.    *    *    *

"*Q.* Now, Mr. Slater, if Rete Keyes had forced himself up there into your room and walked over there in the corner of the room and drank your whisky and you had absolutely nothing to do with furnishing that liquor, what did you dig out for?

"*A.* Simply because I had served one spell up here, and I didn't want any more.

"*Q.* Do you know you were not guilty of doing anything if that was all you done?

"*A.* I was guilty of having the liquor in my room.

"*Q.* Do you claim you did not furnish it to him at all? What made you dig out for if that was it?

"*A.* I don't know that I did furnish it to him; it was there."

It is very apparent, from the testimony of Mr. Keyes and the respondent, that both desired the court and jury to understand that Mr. Keyes did not go to the respondent's room by his invitation, and that he did not, because of respondent's invitation, partake of any of the large quantity of whisky which he imbibed between the time he entered respondent's room sober and the hour and a half later, when he staggered out of the stairway upon the public street, drunk. In a case where liquor was furnished by the hotel clerk to the dining room girls in the room of one of them for social purposes, Justice Blair, in the opinion of the court, used the following language:

" The local-option law was intended, in my opinion, not only to wipe the business out of existence in the county, but to prevent the inhabitants of the county from obtaining liquor within the county. For the latter purpose, the act prohibits any person from giving away intoxicating liquor, and thereby heads off the numerous subterfuges which would interfere with the enforcement of the law. We have held that the statute was not intended to prohibit the individual use of intoxicating liquors, nor to invade the privacy of the home and interfere with the owner's decent exercise of hospitality towards his guests, but we do not think the terms of the act warrant a further limitation of its operation." *People* v. *Myers*, 161 Mich. 40 (125 N. W. 701).

See *People* v. *McCall*, 161 Mich. 674 (126 N. W. 1052). In *People* v. *Peterson*, 156 Mich. 235 (120 N. W. 570, 21 L. R. A. [N. S.] 134), Justice Ostrander, speaking for the court, said:

" The object of the act is to prohibit the manufacture of, and all traffic in, liquors. It cannot be reasonably construed so as to apply to the individual use, or the keep-

ing for use, of liquors by citizens. Whether an individual might, even in his own house, dispense liquors purchased and kept for his own use, in such manner as to make his conduct obnoxious to the law, is a question not presented."

See *People* v. *Giddings*, 159 Mich. 523 (124 N. W. 546). In a concurring opinion by Justice OSTRANDER, in *People* v. *Bedell*, 162 Mich. 230 (127 N. W. 33), he used the following language:

"But I think it proper to say that in my opinion the rooms occupied by an unmarried man may be considered to be his home, in which, in a proper manner, he may be host to a friend or to friends. If the testimony were less conclusive in establishing the fact that this respondent, on this occasion, was permitting others to use his rooms for the purpose of drinking, not only his beer, but the whisky of another, I should regard the charge as faulty in not presenting to the jury the question whether the respondent was acting in good faith and exercising a decent hospitality. Former decisions of this court, which are referred to in the opinion of Mr. Justice MOORE, recognize the distinction here pointed out."

It is apparent, under these decisions, that the important question in the case is whether what was done by respondent was an honest act of hospitality to a guest, without an intention to evade the law, or the contrary. There was testimony from which either inference might be drawn, making it a proper question for the jury.

It is contended the right to have the question submitted to the jury was waived, when counsel for respondent insisted the judge should direct a verdict in his favor. We do not think, because of this position, counsel waived the other point in case the judge found against him upon his contention.

The verdict is set aside, and a new trial ordered.

HOOKER, BROOKE, and MCALVAY, JJ., concurred with MOORE, J. BLAIR, J., concurred in the result.